FILED
US DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

2006 APR 14  A 9: 43

DISTRICT OF UTAH - CENTRAL DIVISION

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRISHA DAWN CARTER,<br><br>Defendant. | **ORDER**<br><br>Case No.: 2:05-CR-349<br>Judge Dee Benson |

Trisha Dawn Carter moves to suppress evidence discovered in her apartment during a search performed pursuant to the terms of Mr. Clete Marshall Aguirre's probation agreement. Having considered the parties' arguments and the relevant law, the Court DENIES Ms. Carter's motion.

*I.*

Mr. Aguirre entered into a probation agreement with the State of Utah on February 16, 2005; the agreement was still in force on April 12, 2005. Among other conditions, the probation agreement provided that Mr. Aguirre would not change his residence without first obtaining permission from his APP officer, Prob. Agr. No. 2, that he would not use or possess illegal drugs, and that he would submit to drug tests to ensure compliance, *Id.* No. 5. Mr. Aguirre was also prohibited from knowingly associating with persons engaged in illegal activity. *Id.* No. 7. In order to ensure compliance with the conditions it imposed, the probation agreement provided for searches; in signing the agreement, Mr. Aguirre agreed to

> permit officers of Adult Probation and Parole to search [his] person, residence, vehicle or any other property under [his] control without a warrant at any time, day or night upon reasonable suspicion to ensure compliance with the conditions of the Probation Agreement.

Prob. Agr. 6.

In April 2005, APP Officer Arnold Hansen, who was supervising Mr. Aguirre's probation, became aware of information suggesting Mr. Aguirre was not complying with a number of the terms of his probation agreement. Mr. Hansen had difficulty discovering Mr. Aguirre's address and, after discovering that address, was told by the Division of Child and Family Services (DCFS) that Mr. Aguirre would soon be moving. Hrg. Tr. at 9. Mr. Aguirre had also refused to take drug tests. *Id.* While Mr. Aguirre claimed to be using a medication that would interfere with the results of a drug test, he had not provided a prescription or any other evidence of such use. *Id.* Another officer testified that he believed DCFS officials, during a recent visit to the home, had been concerned that various people in the apartment were using illegal drugs and that another parolee or fugitive was present. *Id.* at 20.

On April 12, 2005, Officer Hansen decided to investigate the information he had that Mr. Aguirre was violating a number of the conditions of his probation agreement. Officer Hansen, accompanied by three other agents, went to Mr. Aguirre's address and rang the doorbell. The officers knocked on the door and announced "A.P. & P." Hrg. Tr. at 18. While these activities did not produce any response from Mr. Aguirre's apartment, his neighbor from across the hall came to the door and asked what was happening. *Id.* The officers noticed that the door to Mr. Aguirre's apartment was slightly ajar, peered in the several-inches-wide crack and saw a man lying on the couch with his back to the door. *Id.* The officers entered the room and determined that the man on the couch was not Mr. Aguirre. *Id.* at 19. The officers then found another probationer in one bedroom and Ms. Carter in the other bedroom, which she shared with Mr. Aguirre. The couple's child was in the bedroom with Ms. Carter. The police also found stolen mail in Ms. Carter's bedroom and in other locations in the apartment. *Id.* at 29–30. A few days

2

after this interview and search, an officer interviewed Ms. Carter again and she consented to an additional search of the apartment, which yielded additional evidence. *Id.* at 24–25.

Ms. Carter was ultimately indicted for bank fraud, aggravated identity theft, and possession of stolen mail, in violation of 18 U.S.C. §§ 1344, 1028(a), and 1708. Ms. Carter now moves to suppress the evidence obtained by the APP agents, claiming that the probation agreement did not authorize officers to enter the apartment without Mr. Aguirre's consent, and that the officers did not have reasonable suspicion to believe Mr. Aguirre was violating the conditions of his probation in any event. Ms. Carter also suggests the officers' entry violated the knock and announce rule. Finally, Ms. Carter asks that the evidence obtained in the second search, based on her own consent, be suppressed as fruit of the poisonous tree.

*II.*

Ms. Carter's chief argument is that the probation agreement does not constitute Mr. Aguirre's consent to future searches. Ms. Carter maintains that the probation agreement allows officers to ask Mr. Aguirre for permission to search when they have reasonable suspicion that he *is violating a condition of the agreement, but that it does not authorize them to search without* Mr. Aguirre's present consent. According to Ms. Carter, if Mr. Aguirre refuses his consent to a search, the officers' sole recourse is to ask a judge to revoke the agreement.

Ms. Carter's argument, while interesting, is wide of the mark. This Court need not determine whether Mr. Aguirre's probation agreement constitutes a complete waiver of his Fourth Amendment rights or whether he has consented in advance to any and all possible searches. The United States Supreme Court has determined that the special needs of probation systems justify an exception to the Fourth Amendment's warrant requirement. *See Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987); *United States v. Knights*, 534 U.S. 112, 117 (2001). This

3

is so both because probationers have a "significantly diminished . . . reasonable expectation of
privacy," and because the state has a significant interest both in rehabilitating probationers and in
protecting the public from probationers' relatively high rates of recidivism. *Knights*, 534 U.S. at
120–121. The Supreme Court has struck the balance between these interests and determined that
reasonable suspicion—coupled with a probation agreement—justifies a search of a probationer's
residence. *Id.* at 118.

Ms. Carter also seems to suggest that even if the search were valid as to Mr. Aguirre, it
was not valid as to her. Without wishing for a moment to disparage the many benefits of sharing
one's residence with another, the Court must point out that such sharing entails risks as well as
benefits. In sharing her bedroom with Mr. Aguirre, Ms. Carter exposed herself to the risk that a
search valid as to Mr. Aguirre would also reveal evidence regarding her own criminal activities.
For instance, had the police entered the apartment because of exigent circumstances created by
Mr. Aguirre and discovered evidence in plain view implicating Ms. Carter, that evidence would
be admissible against her. If the police had arrested Mr. Aguirre and a proper search incident to
arrest revealed evidence against Ms. Carter, that evidence would be admissible against her. If
Mr. Aguirre had given consent to search and the police had discovered in a common area
evidence against Ms. Carter, that evidence would be admissible against her. *See United States v.
Matlock*, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over
premises or effects is valid as against the absent, nonconsenting person with whom that authority
is shared.").[1]  Whatever the particular legal theory justifying a search, so long as the search is

---

[1]The United States Supreme Court has quite recently reaffirmed the principle that one co-
habitant can give a valid consent to search, so long as the other does not object at that moment:
"if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-
tenant's permission does not suffice for a reasonable search, whereas the potential objector,
nearby but not invited to take part in the threshold colloquy, loses out." *Georgia v. Randolph*,

4

valid at its inception and in its scope, a co-occupant affected by it cannot complain that her Fourth Amendment rights have been violated.

Ms. Carter next argues that even if the probation agreement would have authorized the search had officers had reasonable suspicion that Mr. Aguirre was violating the terms of the agreement, the search was invalid because officers did not have the requisite degree of suspicion. Reasonable suspicion consists of "a particularlized and objective basis for suspecting" that a probationer is not complying with the terms of his agreement. *United States v. Trujillo*, 404 F.3d 1238, 1244 (10th Cir. 2005). APP officers had had difficulty ascertaining Mr. Aguirre's address, providing ample reason to suspect he was not conforming to the probation agreement's requirement that he notify APP before changing his address. Information from DCFS suggesting he was about to change his address again provided additional reason to suspect he was in violation of his probation agreement.[2] Officer Hansen knew that Mr. Aguirre had refused to take a drug test, a violation of another term of his probation agreement. *See Trujillo*, 404 F.3d at 1245 (finding a parollee's recent refusal to take a drug test supported a finding of reasonable suspicion). DCFS had supplied additional information suggesting Mr. Aguirre's involvement in illegal drug use. Finally, officers had information suggesting Mr. Aguirre was associating with

547 U.S. ____, * 17 (March 22, 2006). If a search of a probationer's residence is premised on the probation agreement as consent, *Randolph* raises the interesting possibility that a refusal to consent to a search by a probationer's co-habitant could frustrate the search provisions of a probation agreement. There is no evidence before this Court, however, that Ms. Carter informed the probation officers that they could not search the apartment.

[2]While it is true that some of this information came to APP officers from sources other than their own observation and investigation, in determining whether there is reasonable suspicion to support a probation search, the law does not require "the same degree of demonstrable reliability of particular items of supporting data and . . . the same degree of certainty of violation as is required in other contexts." *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987). The officers were therefore entitled to rely on information they had received from DCFS in determining they had reasonable suspicion to search Mr. Aguirre's residence.

5

persons involved in illegal activities, in violation of yet another term of his probation agreement. The officers had not just adequate, but ample, information to create the reasonable suspicion that Mr. Aguirre was violating not just one, but several conditions of his probation agreement.

Finally, Ms. Carter suggests that the search violated the knock and announce rule, asking whether the officers "violat[ed] the knock and announce rule when [they] entered without waiting for someone to come and answer the door?" Ms. Carter appears to misunderstand the knock and announce rule, which requires police, as a general matter, to knock and announce their presence before making a forcible entry. *See United States v. Banks*, 540 U.S. 31, 36 (2003) ("[T]he common law knock-and-announce principle is one focus of the reasonableness enquiry... the standard generally requires the police to announce their intent to search before entering closed premises."). If the police are generally required to knock and announce their presence, they need not wait long after knocking before entering a dwelling. The Tenth Circuit Court of Appeals, while expressing concern that officers may wait only a few seconds after announcing themselves to force entry, has approved waits as short as fourteen seconds between the knock and announce and the forcible entry. *See United States v. Jenkins*, 175 F.3d 1208, 1214–1215 (10th Cir. 1999). *See also United States v. Gallegos*, 314 F.3d 456, 459 (10th Cir. 2002) ("At least where there are no exigent circumstances justifying a shorter interval, the central inquiry in conducting this determination [how long officers must wait before forcing entry] is whether an objectively reasonable officer would believe that occupants of the residence had a reasonable opportunity to voluntarily admit the officer.").[3]

---

[3]At issue in *Gallegos* was 18 U.S.C. § 3109, which codifies the right of officers under federal law to break open outer doors or windows to execute a warrant if they are refused admittance after notice of the officers' presence and purpose. State officers acting pursuant to state law are not governed by § 3109, but by the Fourth Amendment; the standards are sufficiently similar, however, to use § 3109 and cases elaborating its standards in carrying out the

Defendant concedes that one of the agents knocked, announced "A.P.P.," and rang the bell, leaving only a question as to how long officers waited before opening the door—already ajar—and entering. Def. Memo. in Support of Motion to Suppress at 2. That the officers waited long enough for an occupant to answer the door is made manifest by the fact that an occupant—albeit of the neighboring apartment—did answer the door. The officers knocked, announced, and waited, and complied with the knock and announce rule in doing so.

III.

The Court finds that the officers did knock and announce their presence before entering the apartment. The probation agreement authorized officers to conduct a search with reasonable suspicion that Mr. Aguirre was violating the terms of his probation. The officers had reasonable suspicion to believe Mr. Aguirre was violating the conditions of his probation agreement. Defendant's motion is accordingly DENIED.

**IT IS SO ORDERED**

DATED this _13th_ day of April, 2006.

_Dee Benson_
Dee Benson
United States District Judge

---

Fourth Amendment reasonableness inquiry. *See Jenkins*, 175 F.3d at 1212–1213.